**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CORNERSTONE WARRINGTON, INC., | ) | |
| CORNERSTONE HEALTH & FITNESS LP, | ) | |
| CORNERSTONE NEW HOPE LP, | ) | |
| CONEHOPA, LLC and | ) | |
| THE EVENT CENTER BY CORNERSTONE | ) | Civil Action No.:  2:20-cv-02398-MMB |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| THE CINCINNATI INSURANCE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE CINCINNATI INSURANCE**
**COMPANY'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Pursuant to Fed.R.Civ.P. 12(b)(6) and L.R. 7.1, The Cincinnati Insurance Company ("Cincinnati") moves to dismiss this case because the Plaintiffs fail to state a claim upon which relief may be granted. Based on the allegations of the Complaint ("the Complaint") and the language of Cincinnati's insurance policies ("the Policies"), Plaintiffs cannot prove their claims.

**OVERVIEW AND SUMMARY OF ARGUMENT**

The Policies at issue supply property insurance coverage. They are designed to indemnify loss or damage to property, such as in the case of a fire or storm. Coronavirus (or "COVID-19") does not damage property; it hurts people. Plaintiffs demand the Policies' Business Income, Extended Business Income, Extra Expense, and Civil Authority coverages. But, because they are part of a property insurance policy, these coverages protect Plaintiffs only for income losses tied to physical damage to property, not for economic loss caused by governmental or other efforts to protect the public from disease. The Plaintiffs' allegations establish that they have not sustained any losses attributable to direct physical loss to property. Rather, Plaintiffs allege that the

1

Coronavirus pandemic spreads COVID-19 among humans. Moreover, the same direct physical loss requirement applies to all of the coverages for which Plaintiffs sue. Thus, it applies to the Extended Business Income coverage, the Extra Expense coverage, and the Civil Authority coverage.

At bottom, Plaintiffs bear the initial burden of showing actual direct physical loss to property. This is always necessary to make a *prima facia* case for property insurance coverage. Here, Plaintiffs admit there was no presence of Coronavirus on their premises. And, they admit there was no physical damage to their property. Plaintiffs' own allegations are therefore fatal to their Complaint.

In the absence of direct physical loss, Plaintiffs ask this Court find the Policies apply to cover purely financial losses sustained as a result of COVID-19 related orders requiring non-essential businesses to cease in-person operations. But, because direct physical loss is a fundamental prerequisite to coverage under the Policies, they ask for a vast extension of Pennsylvania law that would create coverage from whole cloth. This should not be permitted.

For all of the reasons, and for the other reasons established below, Plaintiffs' Complaint should be dismissed.

## STATEMENT OF FACTS

### I.   Allegations of the Complaint

The Complaint includes the following allegations:

- Defendant who has issued a commercial property insurance policy with business interruption coverage, is denying the obligation to pay for business income losses and other covered expenses incurred by Plaintiffs for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population. (ECF Doc #1, Complaint ("Compl.") at ¶ 6).

- Plaintiff Cornerstone through various entities operates health and fitness centers, leases commercial real estate, and rents out a banquet and community event center in Pennsylvania. Cornerstone is a citizen of Pennsylvania, whose principal place of business is PO Box 1308, Doylestown , PA 18901. (Compl. at ¶ 8).

- In return for the payment of a premium, The Cincinnati Insurance Company issued Policy Nos. EPP0261383, ETD0469072 and ETD0310275 to Plaintiffs. The Policies are attached [to the Complaint] as Exhibit A. (Compl. at ¶ 13).

- The Cincinnati Insurance Company Polic[ies]. . . provid[e] property, business personal property, business income and extra expense, extended business income, and civil authority coverage for a policy period of July 1, 2017 to July 1, 2020. (Compl. at ¶ 14).

- Pursuant to the Business and Personal Property Coverage Form, the Cincinnati Insurance Company Polic[ies] cover[ ] "direct physical loss of or direct physical damage to Covered Property. . . caused by or resulting from a Covered Cause of Loss." "Covered Cause of Loss" means "risks of direct physical loss unless the loss is . . . Excluded . . . or Limited . . ." (Compl. at ¶ 17) (ellipses in original).

- The Cincinnati Insurance Company Polic[ies'] Business Income and Civil Authority endorsements contain no exclusion for losses caused by governmental orders issued in order to prevent exposure to a virus, and no other exclusion in the policies apply to this coverage. (Compl. at ¶ 19).

- Despite this express coverage language, Defendant Cincinnati Insurance Company has denied coverage in willful disregard of its obligations under its polic[ies] as well as under Pennsylvania law. (Compl. at ¶ 20).

- Efforts to prevent exposure to COVID-19 have caused civil authorities throughout the country to issue orders requiring the suspension of non-essential businesses and preventing citizens from leaving home for non-essential purposes (the "Closure Orders"). (Compl. at ¶ 21).

- Plaintiffs' businesses are not considered "essential," and have therefore been subject to a variety of Closure Orders by state and local authorities, preventing Plaintiffs from operating their businesses, limiting their operations, and/or from use of the covered premises for their intended purpose. (Compl. at ¶ 22).

- These Closure Orders include, but are not limited to, Pennsylvania Governor Wolf's order dated March 19, 2020 requiring all non-life-sustaining businesses in the Commonwealth to cease operations and close all physical locations. The Pennsylvania Supreme Court recently clarified that the Governor's order has resulted in the temporary loss of use of non-essential business premises [a]ffected by the order, and

that the order was issued to protect the lives and health of millions of Pennsylvania citizens. See Friends of DeVito v. Wolf, No. 68 MM 2020, 2020 WL 1847100 at *17 (Pa. Apr. 13, 2020). (Compl. at ¶ 23).

- ***There was no presence of the COVID-19 virus at Plaintiffs' Covered Properties***. Rather, Plaintiffs experienced a "Covered Cause of Loss" by virtue of the Closure Orders which denied use of the Covered Properties by causing a necessary suspension of operations during a period of restoration. ***The presence or absence of the COVID-19 virus would have no effect upon the closure or the loss of business inasmuch as the stay at home orders apply to all non-essential businesses regardless of their exposure to the virus***. The Closure Orders operate as a blockade that prevents employees and patrons from entering the businesses for their intended purpose. (Compl. at ¶ 24) (emphasis added).

- Consistent with the provisions of the Cincinnati Insurance Company Polic[ies] Civil Authority endorsement, the "Covered Cause of Loss" also caused a direct physical loss or damage to property other than at Plaintiff Premises . . . . (Compl. at ¶ 26).

- The Cincinnati Insurance Company agreed to pay for its insured's actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration." (Compl. at ¶ 31).

- A "partial slowdown or complete cessation" of business activities at the Scheduled Premises is a "suspension" under the Polic[ies], for which The Cincinnati Insurance Company agreed to pay for loss of Business Income during the "period of restoration," as well as continuing normal operating expenses incurred, including payroll expenses. (Compl. at ¶ 32).[1]

- "Business Income" means net income (or loss) before tax that Plaintiff would have earned "if no physical loss or damage had occurred." (Compl. at ¶ 33).[2]

- The Extended Business Income coverage extension provides for payment of the actual loss of Business Income the insured incurs during the period that begins on the date that "property is actually repaired. . . and 'operations' are resumed," and ends on the earlier of the date that either the insured could restore "operations" with reasonable speed, or a certain period of days. (Compl. at ¶ 34).

---

[1] In fact, the Policies define "suspension" to mean "slowdown or cessation of your business activities; ***and [t]hat a part or all of the 'premises' is rendered untenantable.***" (See, e.g., Ex. A, p. 62) (emphasis added; internal sub-numbering omitted). No facts alleged in the Complaint show the Plaintiffs' premises were untenantable. But, even if they were, the Complaint fails as a matter of law because it does not allege physical loss to property caused by the Coronavirus, the Closure Orders, or otherwise.

[2] The Complaint purports to quote the Policies' definition of "Business Income". However, the phrase "if no physical loss or damage had occurred" does not appear anywhere, in any of the Policies. As will be shown, where, as here, the allegations of the Complaint conflict with the terms of the Policies, the Policies control. Two of the three Policies at issue were attached as exhibits to the Complaint.

- The Extra Expense coverage extension provides for payment of reasonable and necessary Extra Expense an insured incurs during the "period of restoration" that the insured would not have incurred if there had been no direct physical loss or direct physical damage to property at the Scheduled Premises. (Compl. at ¶ 35).

- The Closure Orders caused direct physical loss and damage to Plaintiffs Scheduled Premises, requiring suspension of operations at the Scheduled Premises. Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiffs' Policy. (Compl. at ¶ 36).

- The Closure Orders caused direct physical loss and damage to property other than Plaintiff's Scheduled Premises, resulting in a prohibition of access to the Scheduled Premises. Losses caused by the Closure Orders thus triggered the Business Income for Civil Authority Actions provision of Plaintiffs' Policies. (Compl. at ¶ 43).

The Complaint contains three counts:[3] 1) Breach of Contract Business Income Coverage; 2) Breach of Contract Civil Authority Coverage; and 3) Bad Faith. The breach of contract claims present questions of contract interpretation for the Court. Likewise, in the context of this Motion to Dismiss, the Court should find as a matter of law that there is no bad faith, because there is no coverage.

## II.    The Plaintiff's Policy

### A.    The Insurance Policy at Issue

Cincinnati issued Policy No. EDT 031 02 75 to Plaintiff CORNERSTONE FITNESS & SPA, CORNERSTONE WARRINGTON, INC. for the policy period March 1, 2018 to March 1, 2021 ("the Warrington Policy").[4] (Ex. A, p. 1).[5] Cincinnati issued the Warrington Policy in

---

[3] The Counts of the Complaint are misnumbered in the Complaint as Count I, Count III and Count IV. Nevertheless, only three counts are pleaded.

[4] The Plaintiffs did not attach a copy of the Warrington Policy to the Complaint. As such, a certified copy of the Warrington Policy is attached as Exhibit A to this brief. Citations to "Ex. A, p. __" refer to the bates-stamped page numbers located in the footer of each page of the Exhibit.

[5] The Complaint includes a number of Exhibits that consist of partial copies of policies, and copies of policies not issued by Cincinnati or under which Plaintiffs do not seek coverage. To streamline this Court's review, Cincinnati attaches copies of the three property insurance policies at issue in this Lawsuit as Exhibits A, B and C to this brief. The Court may take judicial notice of the Policies. *See, e.g., Hynoski v. Columbia Cty. Redevelopment Auth.*, 941 F. Supp. 2d 547, 555 (M.D. Pa. 2013) ("The court may . . . take judicial notice of certain facts, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.")

Pennsylvania, through a Pennsylvania insurance agency. (Ex. A, p. 1). The Warrington Policy insures Plaintiff's premises in Warrington, Pennsylvania. (Ex. A, p. 5; *and see* Compl. at ¶ 8).

Cincinnati issued Policy No. ETD 046 90 72 to Plaintiffs CORNERSTONE HEALTH & FITNESS LP, CORNERSTONE NEW HOPE LP, and CONEHOPA, LLC, for the policy period January 12, 2018 to January 12, 2021 ("the Cornerstone Policy"). (Ex. B, p. 13).[6] Cincinnati issued the Cornerstone Policy in Pennsylvania, through a Pennsylvania insurance agency. (Ex. B, p. 13). The Cornerstone Policy insures Plaintiffs' premises in New Hope and Furlong, Pennsylvania. (Ex. B, p. 17; *and see* Compl. at ¶ 8).

Cincinnati issued Policy No. EPP 026 13 83 to Plaintiff THE EVENT CENTER BY CORNERSTONE, for the policy period July 1, 2017 to July 1, 2020 ("the Event Center Policy"). (Ex. C, p. 11).[7] Cincinnati issued the Event Center Policy in Pennsylvania, through a Pennsylvania insurance agency. (Ex. C, p. 11). The Event Center Policy insures Plaintiff's premises in New Hope, Pennsylvania. (Ex. B, p. 19; *and see* Compl. at ¶ 8).

For present purposes, the pertinent forms are the Building and Personal Property Coverage Form, forms FM 101 05 16 (Warrington and Cornerstone Policies) and FM 101 04 04 (Event Center Policy), and the Business Income (and Extra Expense) Coverage Form, forms FA 213 05 16 (Warrington and Cornerstone Policies) and FA 213 04 04 (Event Center Policy).[8] The Building and Personal Property Coverage form, FM 101 05 16 / FM 101 04 04, is the main property coverage form. The Business Income (and Extra Expense) Coverage form, FA 213 05 16 / FA 213

---

[6] Plaintiff filed a copy of the Cornerstone Policy with the Complaint (ECF Doc. No. 1-15). A true and correct copy of the as-filed document is attached as Exhibit B to this brief. Citations to page numbers refer to the bates-stamped page numbers located in the footer of each page of the Exhibit.

[7] Plaintiff filed a copy of the Event Center Policy with the Complaint (ECF Doc. No. 1-7). A true and correct copy of the as-filed document is attached as Exhibit C to this brief. Citations to page numbers refer to the bates-stamped page numbers located in the footer of each page of the Exhibit.

[8] Certain of the Event Center Policy forms are older editions of the same forms used in the Warrington and Cornerstone Policies. As will be shown, there are no material differences in the coverage provided by the pertinent coverage forms used in the Plaintiffs' respective Policies.

04 04, addresses business income and extra expense. Both editions of forms FM 101 and FA 213 supply Business Income and Extra Expense Coverage, but only if the necessary elements for coverage are satisfied. Both editions of form FA 213 also contain the Extended Business Income and Civil Authority coverages at issue in the Complaint.

**B.     The Policies' Direct Physical Loss Requirement**

The requirement of "direct physical loss" is a core element in property insurance policies like Plaintiffs'. The requirement appears in multiple places. For example, in the Warrington and Cornerstone Policies, direct physical loss to the Plaintiffs' property is required for Business Income coverage:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by ***direct*** "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown on the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

(Warrington Policy, pp. 40 & 116; Cornerstone Policy pp. 52 & 143) (emphasis added). Covered Cause of Loss is defined as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." (Warrington Policy, pp. 27 & 117; Cornerstone Policy pp. 39 & 144). "Loss" is defined as "accidental ***physical*** loss or accidental physical damage." (Warrington Policy, pp. 60 & 124; Cornerstone Policy pp. 72 & 151) (emphasis added).

Likewise, direct physical loss to the Plaintiff's property is required for Business Income Coverage under the Event Center Policy:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by ***direct physical "loss"*** to property at a "premises" which is described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a ***Covered Cause of Loss***.

(Event Center Policy, pp. 62 & 105) (emphasis added). Covered Cause of Loss is defined as "***DIRECT PHYSICAL LOSS*** unless the 'loss'" is excluded or limited by the applicable coverage forms. (Event Center Policy, pp. 51 & 106) (capitalization in original; emphasis added). "Loss" is defined as "accidental loss or damage." (Event Center Policy, pp. 80 & 112).

Accordingly, there is no Covered Cause of Loss, and therefore no Business Income coverage, under any of the Plaintiffs' Policies, unless the insured first establishes, among other things, that there is direct physical loss to covered property.

The requirement of direct physical loss applies to any coverage requiring a Covered Cause of Loss. A Covered Cause of Loss and thus direct physical loss, is an express requirement for coverage under each of the particular coverages involved: Extended Business Income, Extra Expense and Civil Authority. (*See* Warrington Policy, pp. 42 & 118 (Extended Business Income); pp. 41 & 116 (Extra Expense); pp. 41 & 117 (Civil Authority); Cornerstone Policy, pp. 54 & 145 (Extended Business Income); pp. 53 & 143 (Extra Expense); pp. 53 & 144 (Civil Authority); Event Center Policy, pp. 64 & 106-107 (Extended Business Income); pp. 63 & 105 (Extra Expense); pp. 63 & 106 (Civil Authority). Additionally, the Extended Business Income coverage does not apply unless the insured first sustains a "'Business Income' 'loss' payable under [the Policy]." (Warrington Policy, pp. 42 & 118; Cornerstone Policy, pp. 54 & 145; Event Center Policy, pp. 64 & 106-107). Thus, direct physical loss is required for Extended Business Income coverage.

Furthermore, while the definition of Covered Cause of Loss refers to exclusions, exclusions do not come into play unless there is first direct physical loss. See, e.g., *Erie Ins. Grp. v. Catania*, 95 A.3d 320, 322 (2014) ("In actions arising under an insurance policy [Pennsylvania] courts have established a general rule that it is a necessary prerequisite for the insured to establish that his

claim falls within the coverage provided by the insurance policy."); *Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co.*, 2013 PA Super 271, 79 A.3d 1134, 1138 (2013)

### C.    Additional Requirements for Coverage Under the Policies

In addition to the direct physical loss requirement, Civil Authority coverage requires an actual loss of Business Income that an insured sustains if the loss is caused by an action of a civil authority. Under the Warrington and Cornerstone Policies, coverage is only provided if all of the following apply:

**(a)**    A *Covered Cause of Loss* caused damage to property other than Covered Property at the insured premises;

**(b)**    *Access* to the insured premises *is prohibited* by civil authority;

**(c)**    *Access* to the area immediately surrounding the damaged property *is prohibited* by civil authority as a result of the damage to other property; and

**(d)**    The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the *Covered Cause of Loss* that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Warrington Policy, pp. 41 & 117; Cornerstone Policy, pp. 53 & 144) (emphasis added).

The Event Center Policy's Civil Authority coverage is to the same effect. Under the Event Center Policy, the coverage only applies if both of the following conditions are met:

**(a)**    *Access* to the insured premises *is prohibited* by civil authority as a result of the direct physical loss to property other than the insured premises; and

**(b)**    The action of civil authority is taken in response to direct physical loss to the premises, other than the insured premises, caused by or resulting from a *Covered Cause of Loss*.

(Event Center Policy, pp. 63 & 106) (emphasis added).

Accordingly, Civil Authority coverage in all of the Plaintiffs' Policies requires, among other things, direct physical loss to property other than the insured's property and prohibition of access to the insured's property as a result of that direct physical loss.

# ARGUMENT

## I.    Motion to Dismiss Standard

Dismissal is an appropriate mechanism here because this motion presents a pure question of law. A motion to dismiss for failure to state a claim should prevail if, after the complaint's allegations are taken as true and all reasonable inferences are made in favor of the nonmoving party, the nonmoving party cannot prove facts supporting its claim. *See, e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011), *citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Stated another way, to survive a motion to dismiss, a complaint must contain sufficient factual matter to show the claim for relief is "plausible on its face." *Warren Gen. Hosp.*, 643 F.3d at 84; *and see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), *citing Twombly,* 550 U.S. at 570. A claim does not meet the plausibility standard unless it includes enough factual content to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

Importantly, legal conclusions and other unsupported conclusions stated in the Complaint may not be considered in determining a motion to dismiss. *See, e.g., Fischbein v. Olson Research Grp., Inc.*, 959 F.3d 559, 561 (3d Cir. 2020) (In determining whether plaintiff has stated a claim sufficient to survive a motion to dismiss, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."); *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007), *cert. denied*, 552 U.S. 1021 (2007) (On a motion to dismiss, the Court does not accept as true "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.") (internal citations and quotations omitted); *Iqbal,* 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Additionally, the Court should consider the insurance Policies and the Closure Orders. *See, e.g., Doe v. Univ. of Sciences*, 961 F.3d 203 (3d Cir. 2020) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint[,] exhibits attached to the complaint, and matters of public record. In addition, 'a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'") (alteration in original; internal citations omitted); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). The Policies are attached to the Complaint, and this brief. The Closure Orders are matters of public record.

Here, the Complaint's allegations are in conflict with the terms of the Policies and the Closure Orders. This means that the Policy and the Closure Orders control.  *See, e.g.*, *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859, n. 8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control."); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 & n. 22 (4th ed.) (Wright & Miller) ("It appears to be well settled that when a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.") (collecting cases).

Indeed, dismissal for failure to state a claim is appropriate where, as here, the plain and unambiguous language of the parties' contract shows the plaintiff cannot "plausibly allege" its contradictory interpretation. *D & M Sales, Inc. v. Lorillard Tobacco Co.*, No. CIV.A.09-2644, 2010 WL 786550, at *4 (E.D. Pa. Mar. 8, 2010) (Padova, D.J.). In this context, any amendment of

the complaint would be futile since "[p]laintiff cannot state a claim in light of the controlling contractual terms." *D & M Sales, Inc.*, No. CIV.A.09-2644, 2010 WL 786550, at *4.

## II.      There is No Direct Physical Loss and Accordingly There is No Coverage

As shown, the Policies only provide coverage where there is direct physical loss. But, the Complaint does not allege facts showing any direct physical loss to any property. Accordingly, Plaintiffs cannot possibly prove their claim.

### A.      There Are No Facts to Show Plaintiffs' Property was Physically Altered, thus there is No Direct Physical Loss

Plaintiffs ask the Court to create coverage where there is none. This is not allowed under Pennsylvania law. "When the terms of an insurance policy are clear and unambiguous, the court is bound to give effect to the policy and cannot interpret the policy to mean anything other than what it says." *Reeves v. Travelers Companies*, 296 F. Supp. 3d 687, 691 (E.D. Pa. 2017) (Baylson, J.) (internal quotations omitted), *citing Clarke v. MMG Ins. Co.*, 100 A.3d 271, 275 (Pa. Super. Ct. 2014); *Byoung Suk An v. Victoria Fire & Cas. Co.*, 113 A.3d 1283, 1288 (2015) (It is "well settled" under Pennsylvania law that "courts should not 'under the guise of judicial interpretation,' expand coverage beyond that provided in the policy."), *citing Guardian Life Ins. Co. of America v. Zerance,* 505 Pa. 345, 479 A.2d 949, 953 (1984).

No case, in Pennsylvania or elsewhere, has held that a virus constitutes direct physical loss. Moreover, even if the Coronavirus could cause direct physical loss, which it cannot do, the loss at issue here is a purely financial loss caused by the Closure Orders. (*See* Compl. at ¶ 24). As such, Plaintiffs cannot plausibly argue the virus or the Closure Orders caused any physical alteration to their property.

1.      **Pennsylvania Law Requires Physical Alteration to Property; There is
None Here**

Financial losses unrelated to physical loss or physical damage at the insured premises do
not satisfy the Policies' direct physical loss requirement. *Philadelphia Parking Authority v. Fed.
Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y. 2005) (applying Pennsylvania law), is analogous to this
case. There, the plaintiff operated a parking garage at the Philadelphia International Airport.
*Philadelphia Parking Auth.*, 385 F. Supp. 2d at 281. Since its garage depended on the airport to
attract customers, it sustained a significant loss of business when the FAA grounded all flights in
the United States following the 9/11 terrorist attacks. *Id.* at 282-283. Plaintiff sought business
income, extra expense, and civil authority coverage under its property insurance policy.

The business income, extra expense, and civil authority coverage provisions in
*Philadelphia Parking Authority* were substantially similar to those in the Policies here.
Philadelphia Parking Authority's business income coverage applied to the insured's loss of income
during the "period of indemnity" in the event of an actual interruption of the insured's business,
provided that the "actual interruption of [Philadelphia Parking Authority's] operations [was]
caused by ***direct physical loss or damage*** caused by a covered cause of loss . . . ." *Id.* at 282
(emphasis added). Similarly, the civil authority coverage only applied in the event "a civil
authority prohibits access to [Philadelphia Parking Authority's] covered property because of ***direct
physical loss or damage*** caused by a covered cause of loss to property not otherwise excluded in
the vicinity of [Philadelphia Parking Authority's] covered property." *Id.* (emphasis added).

*Philadelphia Parking Authority* holds such provisions unambiguously require that "a
'covered cause of loss' . . . result in some 'direct physical loss or damage,' which in turn must
interrupt the insured's business operations." And, "***the claimed loss or damage must be physical
in nature***." *Id.* at 288 (emphasis added). *Philadelphia Parking Authority* dismisses the complaint

because it did not allege any physical loss or damage to the parking garage or other property in its vicinity. *Id.* at 287 (emphasis in original). As such, the claim "clearly [did] not fit the plain language of the Business Income Provision." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 287.

Here, Plaintiffs' factual allegations show there was no direct physical loss. Plaintiffs admit that the Coronavirus was not present at their premises; but, even if it were, the factual allegations show it was not damaging property. (Compl. at ¶ 24). Instead, Plaintiffs allege that financial losses they sustained because of the Closure Orders constitute direct physical loss. (*See, e.g.,* Compl. at ¶¶ 24-25). But, like the virus, the Closure Orders did not physically alter any property. Rather, the Complaint alleges, the Closure Orders "suspend[ed] or severely curtail[ed] business operations of non-essential businesses that interact with the public and provide gathering places for the individuals." (*See, e.g.*, Compl. at ¶ 3). This was done in order "to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19." (Compl. at ¶¶ 3, 21). Humans infecting humans—through direct contact, or otherwise—is not direct physical loss to property.[9]

In essence, Plaintiffs assert that the Policies' direct physical loss requirement is met whenever a business suffers economic harm. This is contrary to *Philadelphia Parking Authority* and a host of other cases holding that direct physical loss requires actual, tangible, permanent, physical alteration of property, as discussed below.

### 2.   *Philadelphia Parking Authority* is to the Same Effect as the Prevailing Law Nationally

*Philadelphia Parking Authority* is consistent with the prevailing law nationally. *See, e.g.*, 10A *Couch on Ins.* § 148:46 ("The requirement that the loss be 'physical,' given the ordinary

---

[9] The Court may take judicial notice of the fact that essential businesses were permitted to remain open, even where the presence of COVID-19 was confirmed. Thus, the Closure Orders were not issued as a result of any direct physical loss to anybody's property.

definition of that term, ***is widely held*** to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (Emphasis added) (collecting cases); *see also Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.,* 465 F.3d 834 (8th Cir. 2006) (applying Minnesota law); *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co*., 400 F.3d 613 (8th Cir. 2005) (applying Minnesota law); *Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*, 161 F. Supp. 3d 970, 978-979 & n. 4 (D. Kan. 2016) (applying Kansas law) (the phrase "physical loss or damage" "***unambiguously***" requires "***physical alteration***" of property.) (Emphasis added); *NE. Georgia Heart Ctr., P.C. v. Phoenix Ins. Co.*, No. 2:12-CV-00245-WCO, 2014 WL 12480022, at *6 (N.D. Ga. May 23, 2014) (applying Georgia law) ("The court will not expand 'direct physical loss' to include loss-of-use damages when the property has not been physically impacted in some way. To do so would be equivalent to erasing the words 'direct' and 'physical' from the policy."); *J. O. Emmerich & Assocs., Inc. v. State Auto Ins. Companies*, No. 3:06CV00722-DPJ-JCS, 2007 WL 9775576, at *3 (S.D. Miss. Nov. 19, 2007) ("Plaintiff's interpretation of the [insurance] contract would render the words 'direct' and 'physical' meaningless in the context of the policy.") (collecting cases); *Mastellone v. Lightening Rod Mutual Insurance Company*, 175 Ohio App. 3d 23, 2008-Ohio-311¶ 68, 884 N.E. 2d 1130, 1144 (2008) (no direct physical loss because mold could be removed via cleaning, and its presence did not alter or otherwise affect the structural integrity of the siding), citing 10A Couch on Ins. § 148:46 (3d Ed.1998).

 *Source Food* is a seminal case concerning the direct physical loss requirement. There, an embargo on the importation of Canadian beef due to mad cow disease prevented a truck carrying the insured's beef product, which was not itself contaminated, from crossing the border. *Source*

*Food Tech., Inc.,* 465 F.3d at 835. As a result, the insured sustained significant financial losses because it could not fill its customers' orders. *Id.*

Source Food claimed lost business income under its insurance policy. That policy, like the Policies here, covered the suspension of business operations "caused by *direct physical loss to Property*". *Id.* (Emphasis in original). Source Food argued "that the closing of the border caused direct physical loss to its beef product because the beef product was treated as though it were physically contaminated by mad cow disease and lost its function." *Id.* at 836. *Source Food* rejects this argument: "To characterize Source Food's inability to transport its truckload of beef product across the border and sell the beef product in the United States as direct physical loss to property would render the word 'physical' meaningless." *Id.* at 838.

*Pentair* is to the same effect. *Pentair* rejects the insured's contention that its Taiwanese suppliers' inability to function after a loss of power caused by an earthquake constituted direct physical loss or damage. *Pentair, Inc.*, 400 F.3d at 616. *Pentair* holds that loss of use or function is relevant to determining the amount of loss, *but only once the insured first establishes physical loss or damage. Id.* ("Pentair's argument, if adopted, would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose.") (Emphasis in original).

*Source Food* and *Pentair* are well-reasoned cases and should be followed. Moreover, there are no material differences between Minnesota's and Pennsylvania's respective decisions on pertinent insurance law issues. Both states seek to apply the plain meaning of an insurance policy. *See, e.g., Reeves v. Travelers Companies*, 296 F. Supp. 3d at 691, *citing Clarke*, 100 A.3d at 275 (Pa. Super. Ct. 2014); *Guardian Life Ins. Co. of America v. Zerance,* 479 A.2d at 953; *accord, Depositors Ins. Co. v. Dollansky,* 905 N.W.2d 513, 515 (Minn. Ct. App. 2017), *aff'd,* 919 N.W.2d

684 (Minn. 2018). As such, it is appropriate for this Court to follow the sound construction and application of the "direct physical loss" requirement stated in so many cases, including *Philadelphia Parking Authority, Source Food*, and *Pentair*.

Indeed, emerging decisions concerning claims similar to Plaintiffs' show that there is no physical loss or physical damage as required for coverage under similarly worded policies. They hold that the Coronavirus and related closure orders do ***not*** cause "physical," i.e., actual, tangible, structural, loss or damage to property. *See, e.g., Gavrilides Management Company et al. vs. Michigan Insurance Company*, Case No. 20-258-CB-C30 (July 2, 2020, Ingham County) ("Direct physical loss of or damage to the property "has to be something with material existence. Something that is tangible. Something . . . that alters the physical integrity of property."); *Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.*, 1:20-cv-03311-VEC (S.D.N.Y.), ECF No. 24-1 at pp. 5 & 15 (the Coronavirus damages lungs; not printing presses).[10]

Here, as in the precedents Cincinnati relies on, there was no direct physical loss. Plaintiffs admit that there was no physical alteration to their property. (Compl. at ¶ 24)  Indeed, even at premises where the virus has been confirmed to be present, such as hospitals and nursing homes, the buildings have remained open. This is because those properties are themselves undamaged.

The financial losses Plaintiffs assert do not constitute direct physical loss to property. Thus there can be no Business Income or Extra Expense coverage here.

---

[10] No written opinions have been issued in *Gavrilides Management Company* and *Social Life* at the time of filing this brief. The oral arguments and the Court's oral ruling in *Gavrilides* are available for viewing on YouTube: https://www.youtube.com/watch?v=Dsy4pA5NoPw&feature=youtu.be. A copy of the hearing transcript in *Social Life* is available through the Federal Court's filing system, PACER, and is attached for the Court's convenience as Exhibit D to this brief.

**B.      Coronavirus Does Not Affect the Structural Integrity of Property Because it Can Be Removed by Cleaning**

Additionally, there is no direct physical loss in situations where a contaminant or substance can be cleaned. *See*, *e.g.*, *Mastellone*, *v. Lightening Rod Mutual Insurance Company*, 175 Ohio App. 3d 23, 2008-Ohio-311¶ 68, 884 N.E. 2d 1130, 1144 (2008) (no direct physical loss because mold could be removed via cleaning, and its presence did not alter or otherwise affect the structural integrity of the siding), *citing* 10A *Couch on Ins.* § 148:46 (3d Ed.1998); *Mama Jo's, Inc. v. Sparta Ins. Co.,* 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) ("[W]ith regards to Plaintiff's initial claim for cleaning, cleaning is not considered direct physical loss."); *Universal Image Prods., Inc. v. Chubb Corp*., 703 F.Supp.2d at 710 (E.D. Mich. 2010) (a complete cleaning of a ventilation system was not a direct physical loss), *aff'd*, 475 Fed.Appx. 569 (6th Cir. 2012).

The Centers for Disease Control and Prevention (CDC) instruct that the Coronavirus can be wiped off surfaces by cleaning: "The virus that causes COVID-19 can be killed if you use the right products. EPA has compiled a list of disinfectant products that can be used against COVID-19, including ready-to-use sprays, concentrates, and wipes." (*See* CDC Reopening Guidance for Cleaning and Disinfecting (4/28/2020), attached as Exhibit E; *See also* CDC, *Cleaning and Disinfection for Households*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html (accessed June 7, 2020)).[11] Thus, even if the Coronavirus were actually present, there is no direct physical loss because the virus either dies naturally in a short time, or it can be wiped away.

---

[11] Again, this Court may take judicial notice of the CDC reports and other matters of public record without converting Cincinnati's motion to dismiss to a motion for summary judgment. *See, e.g., Hynoski*, 941 F. Supp. 2d at 555.

**C.      The Lack of a Virus-Related Exclusion is Irrelevant Because There is No Direct Physical Loss**

The Plaintiffs claim that coverage exists because the Policies do not contain an exclusion "for losses caused by governmental orders issued in order to prevent exposure to a virus." (Compl. at ¶ 19). That assertion is legally incorrect. An exclusion can become relevant only if Plaintiffs first meet their burden of showing that there is direct physical loss. As established, Plaintiffs cannot do so.

Where an insured fails to meet its burden to show an initial grant of coverage, judgment in favor of the insurer is appropriate. *See, e.g., Fry v. Phoenix Ins. Co.*, 54 F. Supp. 3d 354, 361 (E.D. Pa. 2014) (applying Pennsylvania law) (Stengel, J.), *citing Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co.*, 79 A.3d 1134, 1138 (2013). For instance, in *Fry*, the parties submitted competing evidence concerning whether the policy's wear and tear exclusion applied to preclude coverage for the collapse of an exterior stone veneer wall. *Fry*, 54 F. Supp. 3d at 363-365. But, because the insured's knowledge of existing defects in the wall precluded an initial grant of coverage under the policy's collapse coverage, the exclusion was irrelevant. *Fry*, 54 F. Supp. 3d at 363-365. Likewise, in *Estate of O'Connell*, it was irrelevant whether the trial court misconstrued policy exclusions, because the vehicle involved in the accident did not qualify as an underinsured motor vehicle in the first instance. *Estate of O'Connell,* 79 A.3d at 1138-1141.

Courts throughout the Country agree: where there is no direct physical loss, there is no coverage. As such, policy exclusions are irrelevant. *See, e.g.*, *Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co*., 114 Cal. App. 4th 548, 555, 7 Cal. Rptr. 3d 844, 850 (2003) (database crash did not constitute direct physical loss; therefore, it was "unnecessary to analyze the various exclusions and their application to this case"); *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.,* 17 F. Supp. 3d 323, 333 (S.D.N.Y. 2014) (power outage that caused law firm to close

19

was not direct physical loss; thus, it was unnecessary to decide whether a flood exclusion applied), citing *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1, 9, 751 N.Y.S.2d 4, 10 (2002).

As established, Plaintiffs cannot show the threshold requirement of a Covered Cause of Loss. Covered Cause of Loss means all risks *of direct physical loss* that are neither excluded nor limited. Thus, if there is no direct physical loss in the first place, the existence or absence of an exclusion "for losses caused by governmental orders issued in order to prevent exposure to a virus" is irrelevant. (*See* Compl. at ¶ 19).

In sum, there is no coverage here because there is no direct physical loss. For that reason, no exclusion is needed.

## III.     There Is No Civil Authority Coverage

As established, the Policies' Civil Authority coverage only applies if there is a Covered Cause of Loss, meaning direct physical loss that is not excluded or limited, to property other than the Plaintiff's property. Even then, there is only Civil Authority coverage if, among other things, the action of the civil authority prohibits access to the insured premises. (*See* Warrington Policy, pp. 41 & 117; Cornerstone Policy, pp. 53 & 144; Event Center Policy pp. 63 & 106). "[L]osses due to curfew and other such restrictions are not generally recoverable. * * * If a policy provides for business interruption coverage where access to an insured's property is denied by order of civil authority, access to the property must actually be specifically prohibited by civil order, not just made more difficult or less desirable." 11A *Couch on Ins.* § 167:15.

### A.     There is No Direct Physical Loss to Other Property

Cincinnati has demonstrated that direct physical loss to property other than the Plaintiffs' property is necessary. Courts nationwide have upheld that requirement. *See, e.g., Philadelphia Parking Auth.*, 385 F. Supp. 2d at 289 (applying Pennsylvania law); *Kelaher, Connell & Conner,*

*P.C. v. Auto-Owners Ins. Co.,* 2020 WL 886120, 8 (D.S.C. Feb. 24, 2020); *Not Home Alone, Inc. v. Philadelphia Indem. Ins. Co.,* 2011 WL 13214381, 6 (E.D. Tex. Mar. 30, 2011); *S. Texas Med. Clinics, P.A. v. CNA Fin. Corp.,* 2008 WL 450012, 10 (S.D. Tex. Feb. 15, 2008); *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 131 (2d Cir. 2006).

Just as the Coronavirus is not causing direct physical loss to the Plaintiffs' premises, it is not causing direct physical loss to other property. The Complaint fails to identify any distinct, demonstrable, physical alteration of property, anywhere. Rather, it alleges the Closure Orders have required Plaintiffs' businesses, and the businesses of unidentified others, to "suspend[ ] or severely curtail[ ] business operations" because those businesses "interact with the public and provide gathering places for the individuals." (*See*, *e.g.*, Compl. at ¶ 3). No facts are alleged that demonstrate that these things happened because of direct physical loss to anybody's property. Instead, as the Plaintiffs admit, closing or limiting of business operations protected the public from human to human transmission of the virus: "Pennsylvania Governor Wolf's order dated March 19, 2020 . . . was issued to protect the lives and health of millions of Pennsylvania citizens." (Compl. at ¶ 23).

There are no alleged facts asserting any direct physical loss. There are no alleged facts showing any change or alteration of anybody's physical property by the Coronavirus or the Closure Orders. There are, however, facts showing that the Coronavirus can be removed via cleaning. As established, this is the marker of something that is ***not*** direct physical loss. Accordingly, there is no direct physical loss to any other property as is required for Civil Authority coverage.

### B.    The Requisite Prohibition of Access Is Lacking

The Civil Authority coverage also requires that access to Plaintiffs' premises be prohibited by an order of civil authority. But, the Plaintiffs do not allege the Closure Orders prohibited access

to their premises. Nor could they. Under Pennsylvania's Closure Order non-essential businesses, including Plaintiffs' businesses, remained open and accessible to owners, employees and others so that they could perform minimum basic operations. [12] Because there was no prohibition of access, there is no Civil Authority coverage.

The prohibition of access requirement is pervasive nationally. As discussed, the insured parking garage owner in *Philadelphia Parking* failed to show the FAA's order grounding flights after 9/11 prohibited access to its premises, as required for civil authority coverage under Pennsylvania law. Likewise, in *Ski Shawnee, Inc. v. Commonwealth Ins. Co.,* 2010 WL 2696782, 4 (M.D. Pa. July 6, 2010), a bridge repair hindered or dissuaded the majority of customers from visiting a ski resort. *Ski Shawnee* holds that did not constitute prohibition of access to the premises.

To the same effect is *Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137 (10th Cir. 2004) (applying Oklahoma law) (access to hotels was not prohibited by FAA order grounding flights in response to 9/11 attacks). *See also*, *e.g.*, *Syufy Enterprises v. Home Ins. Co. of Indiana*, 1995 WL 129229, 2 (N.D. Cal. Mar. 21, 1995) (riot-related curfew prevented insured's customers from being out and about, it did not prohibit access to the insured's premises); *Bros., Inc. v. Liberty Mut. Fire Ins. Co.,* 268 A.2d 611, 614 (D.C. 1970) (same); *Schultz Furriers, Inc. v Travelers Cas. Ins. Co. of America*, 2015 WL 13547667, 6 (N.J. Super. L. July 24, 2015) (despite serious traffic issues in lower Manhattan following Superstorm Sandy, it was not completely impossible for the public to access the insured store). *See also, Goldstein v Trumbull Ins. Co*., 2016 WL 1324197, 12 (N.Y. Sup. Ct. Apr. 05, 2016); *TMC Stores, Inc. v. Federated Mut. Ins. Co*., 2005 WL 1331700, 4 (Minn. Ct. App. June 7, 2005).

---

[12] https://www.governor.pa.gov/wp-content/uploads/2020/04/Life-Sustaining-Business-Frequently-Asked-Questions-4.20.20-2.pdf (see pg. 4 at ¶ 14) (permitting "non-life sustaining business which are required to suspend in-person operations retain essential personnel to process payroll and insurance claims, maintain security, and engage in similar limited measures on an occasional basis.")

Because the Complaint's allegations establish access was not prohibited, the Civil Authority coverage does not apply.

## IV.    There is No Bad Faith

There is no bad faith here because, as demonstrated, Cincinnati's coverage position is legally the correct position. There is no bad faith unless an insured presents "clear and convincing evidence: (1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that insurer knew of or recklessly disregarded its lack of a reasonable basis." *Rancosky v. Washington Nat'l Ins. Co.*, 642 Pa. 153, 156, 170 A.3d 364, 365 (2017). Furthermore, in the absence of controlling Pennsylvania precedent, it is not bad faith for an insurer to rely on the "reasoning and approaches that other courts have found convincing." *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 44, 626 A.2d 502, 510 (1993).

Here, Cincinnati's position is legally correct. Thus, it has an eminently reasonable basis for its position. Plaintiffs admit that the Coronavirus did not alter any property at their premises. Indeed, they admit that the virus was not present on their premises. The economic loss caused by the orders was not direct physical loss. Furthermore, Cincinnati relies on closely analogous authority in this jurisdiction and others throughout the country. Accordingly, there is, as a matter of law, a reasonable basis for Cincinnati's position that the Policies do not provide coverage for Plaintiffs' financial losses.

## V.      <u>**Conclusion**</u>

For the reasons established above, the Motion of The Cincinnati Insurance Company to Dismiss Plaintiffs' Complaint should be granted.

Respectfully submitted,

**LITCHFIELD CAVO LLP**

July 13, 2020

BY:   <u>/s/ Lawrence M. Silverman</u>
        Lawrence M. Silverman
         (Bar ID No. 17854)
        1515 Market Street, Suite 1220
        Philadelphia, PA  19102
        Telephone:  215.557.0111
        Facsimile:  215.557.3771
        silverman@litchfieldcavo.com

        **Attorneys for The Cincinnati Insurance Company**